Frank L. EASTLAND, Individually, et al., Plaintiffs-Appellants,

v.

TENNESSEE VALLEY AUTHORITY, et al., Defendants-Appellees.

No. 82–7008.

United States Court of Appeals, Eleventh Circuit.

May 2, 1983.

Rehearing and Rehearing En Banc Denied Sept. 12, 1983.

Paul C. Saunders, New York City, Richard T. Seymour, Lawyers' Comm. for Civ. Rights Under Law, Washington, D.C., for plaintiffs-appellants.

Herbert S. Sanger, Jr., Gen. Counsel, TVA, Justin M. Schwamm, Sr., Thomas F. Fine, A. Jackson Woodall, Jr., Knoxville, Tenn., for defendants-appellees.

Before GODBOLD, Chief Judge, FAY and SMITH *, Circuit Judges.

GODBOLD, Chief Judge:

Plaintiffs brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e *et seq.*, alleging that the Tennessee Valley Authority (TVA) engaged in racially discriminatory employment practices. The original complaint was filed in 1973 by Frank L. Eastland. The district court granted summary judgment against all but two of the plaintiffs. On appeal the Fifth Circuit reversed in part, affirmed in part and remanded the case for further proceedings. The history of these earlier proceedings is set forth in *Eastland v. Tennessee Valley Authority*, 398 F.Supp. 541 (N.D.Ala.1974), *rev'd in part, aff'd in part*, 553 F.2d 364 (5th Cir.1977), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977) (*Eastland I*).

On remand the district court certified James, Nash and Sheffield as representatives of a class consisting of past and present black employees represented by the Salary Policy Employee Panel of TVA's Office of Agricultural and Chemical Development (OACD). Subsequently the individual claims of Eastland [1] and Long were consolidated for trial with the claims of the class and the class representatives.

The non-jury trial was bifurcated under Rule 42(b), Fed.R.Civ.P. Stage I was limited to liability and injunctive relief. Trial of this stage lasted seven weeks; 45 witnesses testified and 790 exhibits were received. The district court held in favor of TVA on all claims and thus never reached the damage stage. We affirm the judgment as to the class claims and the individual claims of the class representatives. We reverse as to Eastland and Long.

## I. Class Claims

TVA is a wholly owned government corporation that provides electricity to the Tennessee Valley region and develops agricultural fertilizers among other projects. OACD is a division of TVA involved in fertilizer research and production.[2]

As originally certified the plaintiff class includes

all past and present black salary policy employees represented by the Salary Policy Employee Panel of Tennessee Valley Authority's Muscle Shoals, Alabama, Office of the Agricultural and Chemical Development, from January 17, 1973 until the present.

The Salary Policy Employee Panel represents white collar employees not in management positions. The positions represented by the Panel are classified into the following salary schedules:

SA—administrative

SB—clerical

SD—engineering and scientific

SE—aides and technicians

SF—custodial.[3]

Each job is given a level or grade within the particular schedule. There are also "steps" within each grade. Higher grades and higher steps within grades have correspondingly higher pay.

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Eastland is also a member of the class.

2. Defendants initially included: (1) members of TVA Board of Directors, S. David Freeman, Richard M. Freeman and N. Robert Clement; (2) the Salary Policy Employee Panel; and (3) Tennessee Valley Trades and Labor Council. The Trades and Labor Council, which represents essentially blue collar workers, did not actively participate in the litigation following entry of the class certification order. At trial the court dismissed Eastland's and Long's individual claims against the Salary Policy Employee Panel. The parties later agreed to dismiss all claims against the Panel with the stipulation that the Panel be bound by the decision on the merits.

3. Employees in management positions are classified on the M Schedule. Public safety employees are classified on the G Schedule. The employees on these schedules are not members of the class.

The plaintiff class (hereinafter referred to as Eastland) alleges that TVA unlawfully discriminates against black employees in promotion, job assignment, transfer, training and other conditions of employment. The controversy centers around the operation and effect of TVA's personnel system. Eastland contends that this system delegates "excessive subjective discretion" to a predominately white supervisory force and that blacks have suffered as a result.

The personnel practices and policies attacked by Eastland include: (1) the written job descriptions[4]; (2) the system for classifying jobs at a particular grade[5]; (3) lack of a formal training program; (4) employee service reviews; and (5) promotion and reclassification procedures.[6]

Eastland's case included both statistical and anecdotal evidence. The district court determined that the quality of both modes of proof was insufficient to establish a prima facie case. We agree.

On appeal Eastland raises a myriad of objections. Because "it is neither practicable nor useful to write appellate opinions dealing in detail with every facet of each case[,]" *Ste. Marie v. Eastern Railroad Ass'n,* 650 F.2d 395, 397 (2d Cir.1981), we confine our discussion to issues whose resolution is necessary to our decision.

A. Class certification

The original complaint was filed on behalf of a class consisting of

all past, present, and future black employees and applicants for employment in TVA's Muscle Shoals, Alabama area operations and facilities, and all black persons who would apply or would have applied for employment in said operations but for the defendant's racially discriminatory recruitment and employment practices or reputation therefor.

The district court initially certified a class consisting of all past and present black employees represented by the Salary Policy Panel at OACD. Following the trial, the court further limited the scope of the class by decertifying the Administrative or SA schedule.

There are key differences between the class as alleged and the class as ultimately certified. The certified class excludes all managerial employees and all employees represented by the Tennessee Valley Trades and Labor Council. It also excludes applicants and those denied employment or deterred from seeking employment because of TVA's discriminatory practices or reputation.

Eastland argues that the district court abused its discretion in narrowing the class. "[S]uits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs." *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977). Eastland emphasizes that the requirements of Fed.R.Civ.Proc. 23 have been met and that under the "across-

---

**4.** The "keystone" of TVA's personnel system is the written job description. The description forms the basis for classification of a job at a certain schedule and grade. A supervisor customarily writes the job description.

**5.** When this litigation was begun TVA used the "classification standard" system for evaluating job descriptions. Under this system the division personnel officer would compare an individual's job description to standards set out in the classification standards manual and determine the grade at which the job should be classified. An employee not satisfied with his evaluation could request review by TVA's Division of Personnel or pursue a grievance or EEO claim.

Around 1975 TVA began the transition to the "factor format" system for evaluating job descriptions. Under this system the division personnel officer evaluates a job description by assigning quantative values to job "factors." The values are set out in guide charts. The job evaluation is then sent to a union reviewer. If the reviewer disagrees the matter may be appealed. A dissatisfied employee may also pursue a grievance or EEO claim.

**6.** An employee may progress to a higher level job by promotion or reclassification. A promotion occurs when an established vacancy is filled with an internal candidate. A reclassification occurs when an employee classified at one level is moved to a higher level because he is already performing the duties and responsibilities of the higher level. Within OACD reclassification accounts for over 80% of employees' advancements to higher level jobs.

the-board" approach to Title VII, parties have been permitted to represent those who "suffe[r] from different practices motivated by the same policies." *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 900 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978) (citations omitted).

These arguments are unpersuasive. The Supreme Court recently has reiterated the importance of careful attention to the requirements of Rule 23[7] and cautioned against the overzealous application of the "across-the-board" approach. *General Telephone Co. v. Falcon,* 457 U.S. 147, 157–160, 102 S.Ct. 2364, 2370–72, 72 L.Ed.2d 740, 749–52 (1982). "The mere fact that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination." *Id.* 457 U.S. at 157, 102 S.Ct. at 2370, 72 L.Ed.2d at 750 (quoting *Rodriguez,* 431 U.S. at 405–06, 97 S.Ct. at 1897–98).

■ The district court limited the scope of the class based on a determination that the representative parties lacked sufficient nexus with the putative class members to adequately protect their interests. The determination that a party would adequately protect the interests of a class is factual and depends on the circumstances of each case. *Guerine v. J & W Investment, Inc.,* 544 F.2d 863, 864–65 (5th Cir.1977). Given the character of the employees' claim and the nature of the evidence required to substantiate it, we find that the district court did not abuse its discretion in narrowing the class.

### B. Legal framework

■ A Title VII action may be based upon disparate treatment or disparate impact or both. In a disparate treatment case proof of discriminatory motive or intent is essential. *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). A plaintiff can create an inference of discriminatory intent by proving the four elements of the *McDonnell Douglas* test[8] or by "offering [other] evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Id.* at 358, 97 S.Ct. at 1866 (footnote omitted).

■ In an action alleging class-wide discrimination plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. at 1855 (footnote omitted). A prima facie case of disparate treatment may be established by statistics alone if they are sufficiently compelling. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 328–29 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Even when the statistics are compelling, the prima facie case is bolstered if the plaintiff offers anecdotal evidence to "[bring] the cold numbers convincingly to life." *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856.

■ Once plaintiff establishes a prima facie case of disparate treatment, the burden shifts to defendant to rebut the inference of discrimination by showing that plaintiff's statistics are misleading or by presenting legitimate non-discriminatory

---

**7.** Fed.R.Civ.P. 23 provides in part:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**8.** Under the *McDonnell Douglas* test a plaintiff may establish a prima facie case by showing that: (1) he belongs to a racial minority; (2) he applied and was qualified for a job; (3) despite his qualifications he was rejected; and (4) after his rejection the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

reasons for the disparity. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Defendant's burden is production not persuasion. If defendant meets its burden, plaintiff may show that the asserted explanations are inaccurate or otherwise unworthy of credence. The ultimate burden of persuasion remains at all times with plaintiff.

A plaintiff may also bring a Title VII action under the disparate impact theory. Disparate impact is used to attack employment practices that are facially neutral yet fall more harshly on a protected class of employees. The employer's intent is not at issue. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). A prima facie case is established by identification of a neutral employment practice coupled with proof of its discriminatory impact. *Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 753 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Disparate impact may be established by statistical evidence. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979). Once plaintiff establishes a prima facie case the burden of persuasion shifts to the employer. *Johnson,* 657 F.2d at 752–53. The employer must then prove either that the practice is related to job performance, *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), or that plaintiff's statistical proof is unacceptable. *EEOC v. Datapoint Corp.,* 570 F.2d 1264, 1269–70 (5th Cir.1978).

### 1. Disparate impact model

Eastland attacks OACD's personnel system under both disparate impact and disparate treatment theories. According to TVA, the attack on the excessive subjectivity of OACD's personnel system fails to identify a specific facially neutral employment practice that can be appropriately tested under the disparate impact model.

TVA relies on *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795 (5th Cir.1982). In *Pouncy* the court states:

The discriminatory impact model of proof in an employment discrimination case is not, however, the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices. Nor may just any employment practice be challenged under this model simply because an uneven racial balance exists in an employer's work force.

. . . .

We require proof that a specific practice results in a discriminatory impact on a class in an employer's work force in order to allocate fairly the parties' respective burdens of proof at trial. The aggrieved party must prove a disparate impact due to the selection procedure. The employer then has the burden of proving that the selection procedure is justified by a legitimate business reason. *Johnson,* 657 F.2d at 753. Identification by the aggrieved party of the specific employment practice responsible for the disparate impact is necessary so that the employer can respond by offering proof of its legitimacy. "Knowledge of a legitimate business reason is uniquely available to the employer who is . . . required to persuade the court of its existence by a preponderance of the evidence." *Id.*

. . . .

None of the three Prudential "employment practices" singled out by the appellant—the failure to post job openings, the use of a level system, and evaluating employees with subjective criteria—are akin to the "facially neutral employment practices" the disparate impact model was designed to test. Unlike educational requirements, aptitude tests, and the like, the practices identified by Pouncy are not selection procedures to which the disparate impact model traditionally has applied. *See* 3 A. Larson & L. Larson, Employment Discrimination § 73.00 (1981 & 1981 Supp.).

*Id.* at 800–01 (footnote omitted).

The use of the disparate impact model in cases such as this one is troublesome. Former Fifth Circuit precedent, however, indi-

cates that subjective selection and promotion procedures may be attacked under the disparate impact theory. *See Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 426–27 (5th Cir.1980), *vacated,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981), *modified and aff'd in part, rev'd in part,* 657 F.2d 750 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Since we agree with the district court that Eastland failed to prove either disparate treatment or disparate impact we need not decide whether this prior case law is distinguishable.

### 2. Standard of review

We review findings of fact under the clearly erroneous standard, Fed.R.Civ.P. 52(a), which applies to questions of "ultimate fact" such as a finding of discrimination or nondiscrimination. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that mistake has been committed." *U.S. v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

### C. The evidence

■ Eastland launches a broad-based attack on TVA's personnel system. The district court found the evidence of racial discrimination in transfers, training, assignment and other conditions of employment unpersuasive. It tersely disposed of these claims, finding that Eastland had failed to carry his burden. We cannot hold the findings of nondiscrimination clearly erroneous. *Pullman-Standard,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66.[9]

The court stated that "the only evidence worthy of review is that on the issue of promotion." Since we are unwilling to disturb the disposition of the other claims, our discussion will focus on the court's treatment of the evidence as it relates to the claim of promotion discrimination.

### 1. The statistics

■ Eastland presented a series of pay rate, initial assignment and multiple regression analyses. The analyses were performed for three different groups of TVA employees:

(1) Data Set A: blacks in the class and whites in TVA facilities south of the Tennessee border served by the Muscle Shoals Area Employment Office (MSEO area);

(2) Data Set B: blacks in the MSEO area and whites in MSEO area;

(3) Data Set OACD: blacks in the class and corresponding whites.

Data Sets A and B include individuals from divisions other than OACD. The district court found the statistics from these sets "irrelevant in determining whether there has been racial discrimination at OACD, a small and unrepresentative portion of [TVA]." Although these statistics could have been considered as corroborative evidence, their rejection was not error.

---

**9.** The certification order limited the class to past and present employees, thereby excluding hiring or applicant claims. The district court refused to consider the initial assignment claims because they were "applicant claims." Since we have held that the certification was not an abuse of discretion, the propriety of the ruling in question turns on whether the initial assignment claims were properly characterized as applicant claims.

Eastland argues that an initial assignment claim is not an applicant claim. An applicant claim relates to the hiring decision. Once a person has been hired, his initial assignment is as much a condition of his employment as is his later promotion or transfer. Eastland cites *James,* 559 F.2d at 316–17, to support the proposition that an initial assignment claim may properly be raised in a case in which hiring discrimination is not at issue. TVA argues that under OACD's procedures applicants are hired for specific positions. Thus the hiring decision includes an initial assignment. TVA distinguishes *James,* pointing out that it involved hiring blue collar workers into unskilled entry level positions and subsequently assigning them to racially segregated departments.

The district court found that the initial assignment claims were applicant claims, thereby implying that OACD's hiring and initial assignment procedures could not be separately analyzed. Although discrete initial assignment claims may be proper in some contexts, the finding that in OACD initial assignment is part of the hiring process is not clearly erroneous.

Eastland's statistics compare salaries of black and white employees. TVA contends that statistics showing disparities in salaries are not probative in determining whether a promotion system is discriminatory. According to TVA, average wage statistics describe "only earnings," and their relationship to the promotion discrimination claim is attenuated.

The analyses use salary as a proxy for position on the job hierachy. The relationship between remuneration and job level is not so attenuated as to invalidate these analyses. Higher salaries generally coincide with higher level jobs. If blacks at TVA earn less than whites it is because they are assigned to lower ranking, lower paying positions. The Fifth Circuit has implicitly accepted the use of a group's average wage as a proxy for position on the job hierachy. *James,* 559 F.2d at 321–27 (court found discrimination in job allocation relying in part on the disparity in average hourly earnings between black and white employees); *Vuyanich v. Republic National Bank of Dallas,* 505 F.Supp. 224, 338 (N.D. Tex.1980). Therefore, while the salary statistics are flawed in other respects they are not irrelevant to the promotion discrimination claim.

### A. Pay rate analyses

The pay rate analyses compare the average annual salaries of black and white employees. The analyses classify the employees according to length of service, level of education, job schedule, and date hired. Statistics were also presented showing the average annual salary upon initial assignment. These analyses generally indicate that black employees earn less than white employees.

The district court gave little weight to the pay rate statistics because they "ignored important differences in skills, education, training and experience ...." The court correctly evaluated the limitations of the pay rate statistics. For example, the pay rate analysis showing that blacks and whites with the same number of years of service are paid differently does not demonstrate discrimination because the other factors which influence salary are not considered. While the pay rate analyses are not without evidentiary value, they are deficient because they fail to take into account the fact that a number of factors operate simultaneously to influence the amount of salary an OACD employee receives. *See Wilkins v. University of Houston,* 654 F.2d 388, 402 (5th Cir.), *reh'g denied,* 662 F.2d 1156 (1981), *vacated,* —— U.S. ——, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982), *remanded on other grounds,* 695 F.2d 134 (5th Cir.1983).

### B. Multiple regression analyses

Multiple regression analysis is a quantative method of estimating the effects of different variables on some variable of interest.

> In multiple regression, one first specifies the major variables that are believed to influence the dependent variable.... There inevitably remain minor influences, each one perhaps very small, but creating in combination a non-negligible effect. These minor influences are treated by placing them in what is called a random disturbance term and assuming that their joint effect is not systematically related to the effects of the major variables being investigated—in other words by treating their effects as due to chance....

> The relationship between the dependent variable and the independent variable of interest is then estimated by extracting the effects of the other major variables ....

Fisher, *Multiple Regression in Legal Proceedings,* 80 Colum.L.Rev. 702, 705–06 (1980) (footnotes omitted).

The probative value of a multiple regression analysis depends in part upon: (1) the inclusion of all the major variables likely to have a large effect on the dependent variables; and (2) the validity of the assumption that the remaining effects (the influences included in the random disturbance term) are not correlated with the independent variables included. *Id.* at 713.

In the case before us Eastland presented two sets of regression analyses and TVA presented one set in rebuttal. In all of the analyses salary is the dependent variable and race (black) is the variable of interest.

In Eastland's first regression the independent variables include: (1) age; (2) years of service; (3) non-technical degree; (4) technical degree; (5) race (other); and (6) race (black). The regression was performed for 1970, 1975, and 1979 on Data Sets A & B, the four city area [10] and OACD. The regression indicates that race (black) has a statistically significant negative influence on salary.

TVA argues that regression analysis is inappropriate in this case because of the small sample size in terms of the number of blacks in the schedules and the lack of information on pre-TVA work experience. TVA, while maintaining that regression analysis is inappropriate, nonetheless presented a set of regression analyses in rebuttal. TVA ran a separate regression for each job schedule, a regression combining schedules D & E, and a regression combining schedules A & B. All of TVA's regressions are based on 1980 data and employ the same independent variables, which include: (1) age; (2) years of education; (3) years of service; (4) social science degree; (5) physical science degree; (6) engineering science degree; (7) Code R—Phd in any field or chemical engineering degree; (8) race (black).[11] With the exception of the E schedule regression, TVA's analyses indicate that race (black) does not have a statistically significant influence on salary.[12]

Near the end of the trial Eastland introduced a second set of regressions with independent variables basically the same as those used by TVA in its regression. The second regression was performed for the year 1979 on data sets A & B and OACD.[13] This regression indicated that race (black) has a statistically significant negative influence on salary.

The district court found the multiple regression analyses insufficient to establish a prima facie case because they failed to adequately reflect job comparability. Eastland argues that the court erred in its appraisal of his regression analyses. According to Eastland, the function of the regression analyses is to demonstrate that blacks and whites with comparable qualifications are assigned to different jobs on the basis of race. The function of the educational degree variable is to account for differences in background and training. Unless TVA hires unqualified persons one would not expect to find racially based wage disparities between persons with similar technical training unless blacks are being shunted into lower ranking, lower paying jobs.

Eastland's defense of his regression analyses is too facile. Accounting for differences in education and years of service does not eliminate all reasonable objections to regressions performed across disparate occupational categories.

TVA maintains that the regressions are entitled to little weight because Eastland: (1) failed to establish an adequate theoretical foundation for his model; and (2) failed to control for job category.[14]

10. The "four city area" includes all TVA facilities in Muscle Shoals, Tuscumbia, Florence, and Sheffield, Alabama.

11. TVA ran a step-wise regression program. The validity of such programs has been questioned. Fisher, *supra,* at 714.

12. Generally an F-value of 4 and/or a probability level of .05 is accepted as statistically significant. On the E schedule regression race (black) had a F-value of 3.96 and a probability level of .0546. These values are at the borderline of statistical significance.

13. Regressions were run on OACD excluding M schedule and OACD excluding F schedule.

14. TVA also insists that the failure of Eastland's regression analyses to account for the influence of pre-TVA work experience seriously undermines the regressions' probative value.

The failure to account for pre-TVA work experience may have some effect on the value of the regressions. *See Valentino v. United States Postal Service,* 674 F.2d 56, 71 n. 25 (D.C.Cir. 1982). In light of the fact that TVA's own regressions did not account for this variable, however, the omission should not have substantially impaired the validity of Eastland's model.

### 1. Eastland's foundation

The probative value of a regression analysis depends in part upon the inclusion of all major variables likely to have a large effect on the dependent variable. *Wilkins v. University of Houston,* 654 F.2d at 402; Fisher, *supra,* at 713. "[A] properly done study begins with a decent theoretical idea of what variables are likely to be important." Fisher, *supra,* at 715. By evaluating the basis upon which the party selected the variables included in its regression the court may assess the model's validity.

> Three kinds of evidence may be offered in support of a regression model; direct testimony as to what factors operated in the decision-making process under challenge, what kinds of factors generally operate in decision-making processes of the kind under challenge, and expert testimony concerning what factors can be expected to influence the process under challenge according to principles of economic theory.

D. Baldus & J. Cole, Statistical Proof of Discrimination Sec. 8.22 at 70 (1980 & 1982 Supp.) (hereinafter Baldus & Cole). The strength of the factual foundation supporting a regression model may be a factor in assessing whether the group status coefficient indicates discrimination or the influence of legitimate qualifications which happen to correlate with group status. Baldus & Cole, *supra,* Sec. 8.021 at 66 (1982 Supp.).

> A defendant's claim that the plaintiff's model is inadequate because a variable has been omitted will ordinarily ride on evidence showing (a) that the qualification represented by the variable was in fact considered, and (b) that the inclusion of the variable in the regression changes the results of the regression so that it no longer supports the plaintiff. Both of these facts are established most clearly and directly if the defendant offers an alternative regression model similar to the plaintiff's except for the addition of the variable in question.

D. Baldus & J. Cole, Statistical Proof of Discrimination Sec. 8.23 at 74 (1980 & 1982 Supp.).

It is also argued that Eastland's regressions should be rejected because they fail to filter out the effects of events occurring before Title VII became applicable to OACD. "Statistics tuned to the proper time period are more probative than statistics not so tuned, but categorical

Eastland did not explain why the variables used in his first regression were selected. Nor did he offer evidence indicating which variables typically determine the salary of an OACD employee.[15] Moreover, TVA's cross examination revealed that Eastland's expert, Dr. Ireland, had only a general understanding of the structure of OACD and was not familiar with the job hierarchy, promotion patterns or the salary level for specific jobs.

TVA's expert, Dr. Martin, challenged the validity of Eastland's model and identified several additional variables which allegedly influenced salary at OACD. TVA maintains that regression analysis is inappropriate in this case, but if a regression is done it should account for the fact that the importance of a variable in predicting salary will vary from schedule to schedule. Using an expanded list of variables, TVA conducted a separate regression for each job schedule.

Eastland's second regression adopted "TVA's variables" but ran the regression for all of OACD. Eastland implies that the validity of this model cannot be questioned because the regression employs TVA's suggested variables. TVA, however, emphasized the importance of accounting for differences between the schedules. Thus the validity of the second regression is based upon that portion of TVA's expert's testimony which Eastland chose to accept.

rejection of the latter is not warranted." *Valentino,* 674 F.2d at 71 n. 26. Eastland's failure to filter out the effects of pre-liability acts is not ground for striking the regressions.

**15.** *See Stastny v. Southern Bell Tel. & Tel. Co.,* 458 F.Supp. 314, 323 (W.D.N.C.1978), *aff'd in part,* 628 F.2d 267 (4th Cir.1980) (lack of solid evidence supporting choice of variables included in regression model was a factor in the court's scepticism concerning the general regression assumption that certain independent variables in fact determine the outcome of decisions); *Presseisen v. Swarthmore College,* 442 F.Supp. 593, 616 (E.D.Pa.1977), *aff'd,* 582 F.2d 1275 (1978) (lack of expert testimony concerning what factors "typically go into the setting of salaries of a college faculty member" undermined value of plaintiff's statistical expert's testimony and regression model).

Eastland never directly refutes TVA's contention that a variable's importance in predicting salary varies among the job schedules. Instead, he emphasizes that by performing a separate analysis for each schedule one decreases the likelihood of finding statistically significant relationships. In sum, Eastland failed to establish a sufficiently strong theoretical foundation for his regression analyses.

2. Failure to control for job category

Eastland's regressions include a large number of qualification variables. At no point, however, do his regressions control for job category. The district court found this defect fatal.

■ Eastland's regressions predict salary across all OACD job schedules with one set of variables. Thus, the regression equation attempts to fit all the variables to the data set without regard for job category. TVA asserts that the importance of a variable in predicting salary varies among the schedules and even among the job titles within the schedules. Therefore, a regression should account for the "interaction" between the kind of job and the other variables.[16] For example, if the pay range for the F schedule is $13,000 to $15,000 and the range for the M schedule is $20,000 to $55,-000, a variable such as years of experience means more on the M schedule than on the F schedule. A regression that does not account for the kind of job and years of experience may yield a statistically significant race effect simply because blacks are more highly represented on the F schedule.

■ While maintaining that regression analysis is inappropriate in this case, TVA's expert attempted to build a model that would account for interaction between the

independent variables and job schedule. TVA says that it was unable to perform the analysis because of difficulties with the logic and complexity of the model and the limited data base. Unable to produce an adequate regression model for all of OACD, TVA opted for a set of regressions broken down by job schedule. TVA's regressions showed a race effect only in the E schedule.

Eastland contends that TVA's regression fails to undermine the probative value of his analyses, pointing out that: (1) the breakdown by job schedule reduces the size of the data base, thereby making it more difficult to establish statistically significant relationships;[17] and (2) TVA's own regression shows a race effect on the E schedule. Although Eastland's arguments are not frivolous, the bottom line in the prolix arguments and responses presented to us is that his regression analyses fail to control for job category.

A recent opinion of the D.C. Circuit supports the contention that a regression performed across disparate occupational categories must somehow account for job classification. In *Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982), the plaintiff brought a Title VII action against the Postal Service charging that the subjective promotion system for upper echelon positions discriminated against women. Plaintiff introduced regression analyses that attempted to estimate the influence of sex, length of government service, and years of education on the salaries of Postal Service employees. The court rejected them because of the failure to control for the type of education and job category. *Id.* at 70.

*Valentino* noted that a plaintiff's statistical data need not consider every conceivable

---

**16.** Baldus & Cole have recognized that
one should consider "interaction" variables, which take account of possible interactions between the primary qualification variables. For example, in the hypothetical wage case, a given increase in the quality of an individual's performance may produce a larger wage increase for people with high seniority than for those with low seniority. In such a case, an interaction variable will be required to describe this relationship; a model that as-

sumes that the wage received is simply the sum of the amounts determined individually by the candidate's seniority and job performance will not fit the data adequately.
Baldus & Cole, *supra,* Sec. 6.313[2] at 203.

**17.** "All other things being equal, the test statistic and level of significance rise as the sample size increases." Baldus & Cole, *supra,* Sec. 9.221 at 309.

factor relevant to a promotion decision but "the *minimum objective qualifications* necessary for one to be eligible for promotion must be considered." *Id.* at 68 (quoting *Davis v. Califano,* 613 F.2d 957, 964 (D.C. Cir.1980)) (emphasis in original). The court noted that the burden of comparing appropriate groups in terms of minimum objective qualifications was "onerous" in the case because of the variety of occupational categories involved. In the present case Eastland's analyses account for many objective qualifications, but the failure to control for job category casts doubt on whether the regressions are comparing appropriate groups.

Given the weakness of the theoretical foundation and the failure to control for job category, the district court did not err in determining that Eastland's regressions were insufficient to establish a prima facie case.[18]

### 2. Individual testimony

 Eastland presented testimony from over 20 OACD employees, each of whom testified to having been discriminated against in some manner. The district court found the anecdotal evidence unconvincing and therefore insufficient to establish a prima facie case of discrimination. We have reviewed this evidence, and we cannot hold that the district court erred in concluding that it failed to establish a prima facie case.

Considering both the statistical and anecdotal evidence presented on behalf of the plaintiff class the district court's finding of non-discrimination is not clearly erroneous.[19]

### II. Individual claims

### A. Eastland

 Eastland applied to TVA for a position as a helicopter pilot. When two openings subsequently arose, white applicants were selected. Eastland contends that he was adequately qualified for the job and the decision not to hire him was racially motivated. The court found that Eastland failed to prove hiring discrimination. The finding of nondiscrimination is clearly erroneous because it is based on several subsidiary findings that are clearly erroneous.

Under the *McDonnell Douglas* test, a plaintiff may establish a prima facie case of intentional discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). The district court erroneously found that Eastland had not shown that he was adequately qualified. Eastland was a licensed pilot with considerable flying experience.[20] TVA has failed to identify any standard additional requirements that applicants must meet.[21]

The court also found that Eastland failed to prove that, after his rejection, TVA continued to seek applications from similarly qualified persons. The court's position is

---

**18.** TVA presented statistics showing that the percentage of blacks in each job schedule at OACD was greater than the percentage of qualified blacks in the outside labor market. TVA also presented progression charts showing the time black and white employees spend in each grade before promotion. The court found TVA's labor market statistics the most relevant statistical data presented. The progression charts were also favorably received. We express no opinion regarding the court's evaluation of TVA's statistical proof, and we disregard these findings as surplusage.

**19.** Having reached this conclusion we have no reason to review the court's findings regarding the subjectivity of OACD's personnel system.

**20.** When Eastland applied he had a commercial certificate for helicopters with an instrument rating and a private pilot certificate for single-engine fixed-wing aircraft. In the military and elsewhere Eastland had accumulated over 1,500 hours of helicopter flight time and over 200 hours of single-engine fixed-wing time.

**21.** TVA hired Eastland as a pilot four months prior to trial. His helicopter pilot qualifications were then substantially identical to his qualifications as of 1972.

that Eastland was at best minimally qualified and TVA never sought minimally qualified applicants; the record does not support this conclusion. The finding that after Eastland's rejection TVA did not continue to seek applications from persons with similar qualifications is clearly erroneous.

Eastland established a prima facie case of intentional discrimination. The burden then shifted to TVA to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. TVA's burden is production not persuasion. If TVA carries its burden then Eastland must prove that the asserted reasons are pretextual.

The district court found that even if Eastland established that he was qualified for the position, TVA's hiring decision was justified because the white applicant had superior qualifications. But TVA's selecting supervisor did not know whether the white applicant's qualifications were superior at the time the hiring decision was made. TVA's decision cannot be defended on the basis of the relative qualifications of the applicants if these qualifications were not considered.

The court also found that Eastland's failure to apply for temporary employment justified TVA's decision not to hire him. TVA, however, did not assert that it rejected Eastland on that basis.

In sum, Eastland established a prima facie case of intentional discrimination and proved that the articulated nondiscriminatory reasons for TVA's hiring decision were mere pretexts. The judgment must be reversed as to Eastland.

### B. Long

■ Sanford Long was hired in 1950. During his career at TVA he worked as a laborer, a chemical plant operator and phosphorus recovery operator.[22] He was authorized to serve as a substitute Phosphate Handling Shift Foreman as well as a substitute Chemical Plant Foreman.

In 1975 an opening arose for Chemical Plant Foreman. A white employee, James Hammock, was selected for the position. Long claims that his nonselection as Chemical Plant Foreman was racially motivated. The district court found that although Long was qualified for the position, the white candidate, Hammock, was better qualified. According to the court, Long failed to prove that racial discrimination was the reason for his nonselection. This finding is clearly erroneous.

Long established a prima facie case of intentional discrimination under *McDonnell Douglas* by showing (1) he was black; (2) he was fully qualified for the promotion; (3) he was rejected; and (4) after his rejection Hammock was selected.

The district court found that TVA had rebutted Long's prima facie case by articulating legitimate nondiscriminatory reasons for his nonselection. TVA asserts that Hammock was better qualified because of his broader training experience, initiative and leadership ability. We need not decide whether TVA met its burden of articulating legitimate reasons for its decision because Long established that TVA's asserted reasons were pretexts for discrimination. The findings to the contrary are clearly erroneous.

Long had more seniority than Hammock both as a TVA employee and as a substitute Chemical Plant Foreman. Hammock had both an attendance and drinking problem before and after his selection as foreman. The finding that Hammock's problems did not arise until after his promotion is clearly erroneous. Moreover, Long presented considerable evidence of Bellew's (TVA's selecting supervisor) racial bias. The district court found Bellew was not racially biased based largely on the testimony of a single witness. Four black employees, however, testified as to Bellew's racially discriminatory behavior. After reviewing the evidence we are left with the definite and firm conviction that the court's finding is in error.

The judgment as to Long must be reversed.

**22.** In 1976 Long retired from TVA on a disability pension.

C. James

TVA hired William James as an SF–1 janitor. After several years James was reclassified as a bathhouse custodian SF–2. In 1976 his job classification was reduced from bathhouse custodian, SF–2, to janitor SF–1 under reduction in force procedures prescribed by the Civil Service. James alleges that his demotion was the result of discrimination. We agree with the district court that James' claim is without merit.

TVA maintains that James' grade classification was reduced because of a corresponding reduction in his duties. According to James, the reduction in his workload that prompted his demotion was caused by TVA's tolerance of makeshift bathhouses used by employees who refused to use integrated facilities.

The record supports the finding that in 1976 there was insufficient work at the bathhouse facilities to support James' SF–2 position. James did not demonstrate that the decision to demote him was motivated by a racial animus.

D. Nash

Nash makes three separate claims. As to each the district court found in favor of TVA. We see no error.

First, Nash claims that TVA has taken reprisal against him for contacting an EEO officer. To establish a prima facie case of reprisal, an employee must show by a preponderance of the evidence (1) that he engaged in a protected activity and that that fact was known by the employer; (2) that the employer took an adverse action against him; and (3) that there is a causal connection between the protected activity and the adverse action. *Smalley v. City of Eatonville,* 640 F.2d 765, 769 (5th Cir.1981). Evidence that the adverse treatment followed closely upon the protected activity (i.e., contacting an EEO officer) may be sufficient to establish a causal connection. *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1141 and n. 13 (5th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). It is undisputed that Nash contacted an EEO counselor and as a result of that meeting the counselor recommended that TVA conduct a service review of his performance. The review was generally positive but included the comment: "during the early part of the review period [Nash's] work output was below his full capacity." It is not clear that this comment alone constitutes adverse action. In any event, based on the testimony of Nash's supervisor, the court found that the comment was not made in reprisal for EEO activities. This finding is not clearly erroneous.

Nash's second claim is that he was improperly denied reclassification. He testified that there was no material difference in his work before or after he was reclassified from SE–4 to SE–5 in 1976. The findings that Nash failed to prove he was entitled to an earlier or higher reclassification are not clearly erroneous.

Nash's third claim is that he was discriminatorily denied access to the M schedule. In defining the class the district court excluded employees on the M schedule and subsequently ruled that promotions to the M schedule were not a part of the case. We have already determined that the court did not abuse its discretion in narrowing the class. In any event, Nash failed to introduce sufficient evidence to prove his claim.

E. Sheffield

Louie Sheffield joined TVA in 1951 as a chemical aide on the E schedule. He was promoted to SD–1 in 1963 and to SD–2 14 months later. Sheffield claims that: (1) TVA's failure to recommend him for reclassification to SD–3 earlier in his career was caused by racial discrimination; and (2) he was wrongfully denied reclassification from SD–2 to SD–3 in late 1972 after his supervisor had recommended the reclassification. The court found Sheffield's claims to be without merit, and we affirm.

The district court found that Sheffield failed to prove that racial bias caused TVA to delay recommending his reclassification to SD–3. This finding is not clearly erroneous.

In November 1972 Sheffield's immediate supervisor recommended him for reclassifi-

cation. The reclassification was not effected until August 1973. The court found that TVA's delay in reclassifying Sheffield was caused by the psychological effect of the hiring freeze and the ceiling on average grade level imposed by the executive branch of the government. The finding that Sheffield was not singled out for different treatment because of his race is not clearly erroneous.

We AFFIRM the judgment as to the class claims and the individual claims of the class representatives, James, Nash and Sheffield. We REVERSE the judgments entered against Eastland and Long and REMAND for further proceedings.