**Christina Fang–Hui LIAO, Plaintiff–Appellee,**

v.

**TENNESSEE VALLEY AUTHORITY, et al., Defendants,**

**Charles H. Dean, Jr., in his official capac-ity as a member of the Board of Di-rectors of the Tennessee Valley Author-ity; John B. Waters, in his official ca-pacity as a member of the Board of Directors of the Tennessee Valley Au-thority, Defendants–Appellants.**

No. 87–7379.

United States Court of Appeals, Eleventh Circuit.

March 16, 1989.

---

Justin M. Schwamm, Sr., Asst. General Counsel, Tennessee Valley Authority, Thomas F. Fine, Sr. Litigation Atty., John P. Kernodle, Knoxville, Tenn., for defendants-appellants.

Robert E. Williams, McGuiness & Williams, Washington, D.C., for amicus curiae Equal Employment Advisory Council.

W. Bradford Reynolds, Dept. of Justice, Roger Clegg, Jessica Dunsay Silver, Robert J. Delahunty, Washington, D.C., amicus U.S.A.

Ernest A. Blasingame, Jr., Florence, Ala., Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiff-appellee.

Julius LeVonne Chambers, Charles Stephen Ralston, New York City, for amucis curiae N.A.A.C.P.

Before RONEY, Chief Judge, JOHNSON and SMITH *, Circuit Judges.

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

RONEY, Chief Judge:

In this employment discrimination case, the district court held that an employer who violates a voluntarily adopted affirmative action plan automatically violates Title VII's prohibitions as well. We reverse.

The Tennessee Valley Authority hired plaintiff Christina Fang–Hui Liao, a woman of Chinese descent, in July 1977, as a research chemist in the Soil and Fertilizer Research Branch of TVA's National Fertilizer Development Center. At the time of her employment, Liao held a Ph.D. in Agricultural Science and had five years experience in the field. Liao's entrance classification was SD–3, although at the time of her termination she had been reclassified to the higher position of SD–4.

Shortly before she was hired, TVA had adopted an affirmative action plan (AAP) which governed the branch for which Liao worked. The plan, dealt with at some length in the district court opinion of May 6, 1987, 658 F.Supp. 1554, recognized the "limited participation" by women and blacks in management and in the scientific and engineering occupations. The plan identified "ambitious" goals and stated that:

> [a]ll vacancies are targeted ·to be filled with women or minorities. Our AAP is structured so as to identify applicant pools and overcome recruitment barriers to the extent possible for both internal and external sources. Recruitment strategies include a concerted effort to recruit and promote from within the division and TVA as well as extensive effort from the civilian labor force.

The plan identified numerical goals for hiring minorities and women in "targeted occupations" but also noted that the under-representation was due to the fact that "[v]ery few women and blacks are pursuing advanced degrees in the agricultural sciences and engineering." The plan did not contain provisions governing procedures to be followed during any cutbacks in staff size.

In 1981, due to budget cuts, TVA began preparing for a reduction in force (RIF). A communication from the Office of Personnel Management admonished TVA to consider the impact that a reduction in force would have on "veterans, handicapped, minority and female employees" who, because they are often the most recently hired under newly adopted affirmative action programs, become the first to be let go when reductions in force are implemented on a seniority basis.

Dr. Liao was fired from the Soil Fertilizer Research Branch as a result of this reduction in force. She filed a charge of sex and race discrimination with TVA's internal Equal Employment Opportunity office. The examiner found that Liao had established an inference of discrimination by showing that she was a member of two protected classes, that she was reasonably performing her duties, that she was fired during a reduction in force and that others not in her protected classes were not fired. The employer's position, both in the EEOC proceedings and in the district court, was that Dr. Eugene Sample, Chief of the Soil and Fertilizer Research Branch, was told that in making cuts, he was not to eliminate an entire area of research, if possible, and he was to attempt to continue high-priority projects. Only the nitrogen research —in which Liao was one of three project leaders—could withstand a cut and the other two project leaders had more broad-based expertise than Liao.

Although not addressing pretext, the examiner concluded, however, that the TVA's reasons for terminating her were non-discriminatory and legitimate. These findings were adopted by the EEO office and upheld on review by the Merit Systems Protection Board and the Equal Employment Opportunity Commission.

Liao then filed suit in federal district court for the Northern District of Alabama alleging that her termination was motivated by sex and in retaliation for her several complaints about alleged discriminatory practices at the TVA.

After a bench trial, the district court on May 6, 1987, entered its order finding that the TVA had violated its affirmative action plan in dismissing Liao and consequently, had violated Title VII. The court, relying on *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), found that an employer is required to adhere to its affirmative action plan even though it was adopted voluntarily and without any admission of a past history of discrimination.

We note that the issue of whether the affirmative action plan was violated here was much disputed. The defendants argue that the plan addressed only *hiring* preferences, not *termination* preferences. In any event, plaintiff contends, Title VII creates a statutory affirmative action obligation on federal departments and agencies which applies to both hiring and termination, regardless of the specific provisions of any particular plan. We need not resolve this dispute because even if the affirmative action plan did create an implied obligation to give protection to minorities and women in termination decisions as well as in hiring and promotion, its violation alone is not enough to trigger a Title VII violation.

*Johnson* does not require otherwise. In that case, the Supreme Court dealt with the issue of whether an affirmative action program which allowed sex and race to be taken into account when making employment decisions, in the particular case whether a qualified woman could be hired in preference to perhaps a marginally better qualified white male, violated the strictures of Title VII. The Court held that such considerations were permissible, quoting its earlier decision in *Steelworkers v. Weber*, 443 U.S. 193, 204, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979) in which it stated:

It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long' ... constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy (citations omitted).

*Johnson,* 480 U.S. at 628–29, 107 S.Ct. at 1450.

In *Weber,* the Court upheld an affirmative action plan which specified that 50 percent of trainees for a newly established craft program were to be black because considering race in hiring goals was consistent with Title VII's objective of "break[ing] down old patterns of racial segregation and hierarchy." 443 U.S. at 208, 99 S.Ct. at 2730. Thus, *Weber* and *Johnson* both *permit* the TVA to follow an affirmative action plan which targets the hiring of women and minorities.

These cases do not hold, however, that such preferences are mandatory or that once an employer undertakes a voluntary plan it will be liable for a Title VII violation for every deviation. The Supreme Court simply held that Title VII allows for voluntary affirmative action that is "moderate" and "flexible" and which addresses a gradual improvement in the representation of minorities and women in the workforce, instead of strict numerical goals. 480 U.S. at 642, 107 S.Ct. at 1457–58. It did not, and it could not consistent with Title VII, order that these individuals be given preferential treatment in every case. As Justice Stevens wrote in his concurring opinion:

> It remains clear that the Act [Title VII] does not *require* any employer to grant preferential treatment on the basis of race or gender, but since 1978 the Court has unambiguously interpreted the statute to *permit* the voluntary adoption of special programs to benefit members of the minority groups for whose protection the statute was enacted.

*Id.* at 644, 107 S.Ct. at 1458–59.

Instead, the Court stressed that the plan in *Johnson* "earmarks no positions for anyone; sex is but one of several factors that may be taken into account in evaluating qualified applicants for a position." *Id.* at 641, 107 S.Ct. at 1457. Women applicants had to compete with other applicants. *"No* persons are automatically excluded from consideration; *all* are able to have their qualifications weighed against those of oth-er applicants." *Id.* at 638, 107 S.Ct. at 1455.

Thus, while the TVA's affirmative action plan is permissible under *Johnson,* it is not mandatory, and the failure to give a preference under such a plan cannot be used to support an allegation of discrimination in employment decisions. The caselaw in this Circuit leads to this result. In *Ferguson v. Veterans Admin.,* 723 F.2d 871 (11th Cir.), *cert. denied sub nom. Ferguson v. Walters,* 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984), this Court held that failure to follow an affirmative action plan in training an individual for a job as a librarian did not violate Title VII. Adopting the reasoning of the Fourth Circuit in *Page v. Bolger,* 645 F.2d 227 (4th Cir.) (*en banc* ), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), this Court determined that "absent a showing of discrimination, there is no Title VII cause of action for the failure to implement or utilize an affirmative action program." 723 F.2d at 872. Rather, Title VII requires a showing of either disparate treatment of an individual in comparison to other employees, or disparate impact of employment practices upon protected groups of employees, or both. *Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 618 (11th Cir.), *modified by* 714 F.2d 1066 (11th Cir.1983), *cert. denied sub nom. James v. Tennessee Valley Authority,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984). *See also Gilchrist v. Bolger,* 733 F.2d 1551 (11th Cir. 1984).

Liao argues that the district court did find that she was the victim of disparate treatment in accordance with *Ferguson.* She contends that because the court stated in its initial opinion that it was concerned with whether the TVA conduct "reflects an adverse white male reaction to TVA's affirmative action program," the issue was framed as whether intentional discrimination or disparate treatment had occurred. By also "finding" that Dr. Bock was not as qualified as Liao, she argues, the district court also rejected the TVA's justification as pretextual. A pretextual reason is the equivalent of a finding of intentional discrimination, Liao concludes.

The district court's May 6 opinion states, however, that because of its interpretation of the mandate of *Johnson,* "there is no need for this court to determine whether or not TVA's decision to terminate Dr. Liao was impermissibly or directly motivated by her race and/or her sex." This clearly shows that the district court equated a violation of the affirmative action plan with a violation of Title VII and thought it unnecessary to engage in an analysis of whether intentional discrimination had occurred.

The district court's supplemental opinion of December 16, 1987, does not change the result. Nearly six months after the appeal was filed, Liao asked the district court on December 14 for a "clarification of findings of fact pursuant to Fed.R.App.P. 10(e)." The order was issued two days later.

The supplemental opinion issued in this case does not fall within Rule 10(e) which provides that "[i]f anything material to either party is omitted from the record by error or accident or is misstated therein ... the district court ... may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted." The rule contemplates correction of a record to reflect what occurred below; it does not permit a new or different record to be created. *See, e.g., United States v. Johnson,* 713 F.2d 633, 648 (11th Cir.1983), *cert. denied sub nom. Wilkins v. United States,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Page,* 661 F.2d 1080, 1082 (5th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 136 (1982); *Anthony v. United States,* 667 F.2d 870, 875 (10th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982).

Even if the supplemental opinion was proper under Rule 10(e), it remains clear to this Court that the crux of the later opinion was still the failure of the employer to follow the affirmative action plan. The district court wrote that "Liao was terminated contrary to the mandate and purpose of the AAP promulgated by defendants.... [T]he allegedly legitimate nondiscriminatory reason articulated by defendants is automatically and by definition 'pretextual,' because it was in clear violation of the AAP and not justifiable in terms of any intervening or overriding principle of 'seniority.' "

Since a violation of the affirmative action plan cannot serve as the basis for a Title VII violation, and the evidence would not support a finding that the defendant had otherwise violated the provisions of Title VII, the defendant was entitled to judgment as a matter of law.

REVERSED and RENDERED.