**John R. KILLINGER, Plaintiff,**

v.

**SAMFORD UNIVERSITY, Defendant.**

**Civil Action No. 94–AR–3007–S.**

United States District Court,
N.D. Alabama,
Southern Division.

Feb. 14, 1996.

774

Robert R. Baugh, John C. Falkenberry, Sirote and Permutt P.C., Birmingham, AL, for plaintiff.

Peyton Lacy, Jr., Joseph W. Mathews, Jr., James C. Pennington, Lange, Simpson, Robinson & Somerville, Birmingham, AL, for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

Does this court have jurisdiction over the claim of religious discrimination brought by John R. Killinger ("Dr. Killinger") against his employer, Samford University ("Samford")? This is the first and dispositive question presented by Samford's pending motion for summary judgment. Dr. Killinger proposes to append to his purported federal cause of action other claims against Samford based on state law. First, of course, he must put forward a viable *federal* claim in order to establish jurisdiction in this court.

Dr. Killinger specifically invokes Title VII of the Civil Rights Act of 1964, as amended, claiming that he is the victim of intentional religious discrimination in one or more terms or conditions of his employment by Samford. 42 U.S.C. § 2000e–2, entitled "Unlawful Employment Practices," provides, *inter alia:*

(a) Employer practices.

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against any individual with respect to* his compensation, *terms, conditions, or privileges of employment, because of such individual's* race, color, *religion,* sex, or national origin. . . .

(emphasis supplied). In considering Samford's motion for summary judgment, Dr. Killinger is entitled to the benefit of all logical inferences from the undisputed facts and/or to convince the court that Samford has failed to demonstrate that there are no disputed questions of material fact.

The concept of "academic freedom" is generally thought of as noble and salutary. This court does not intend to take the negative side in any debate over the societal value of "academic freedom." This court is not a

debating society but a court of limited jurisdiction. It thankfully has not been assigned the task of monitoring the degree of academic freedom or of diversity of thought afforded by Samford or by any other private institution of higher learning within the territorial reach of the court. The court must always examine its own jurisdiction even without a formal jurisdictional challenge.

█ Simply put, Dr. Killinger claims that he is a faculty member, highly qualified to teach courses in religion, but that, despite Samford's having induced him to join the faculty by promising him that it intended in future to foster diversity and liberality in theological thought, particularly in its new Beeson Divinity School, he has been denied the teaching assignments he was entitled to expect, Samford's reason or motivation being that Dr. Killinger's theological and philosophical positions are frowned upon by the "powers-that-be." In particular, Dr. Killinger relies upon the Last Will and Testament of Ralph W. Beeson, by which Beeson bequeathed a large sum to Samford for the establishment of a divinity school. This bequest contained certain conditions, arguably including a requirement that the school recruit and maintain a faculty with diverse points-of-view within the Protestant tradition. Dr. Killinger would have a court and jury interpret Samford's acceptance of the Beeson bequest as the taking of the vow of diversity. He insists that the alleged strings attached by Beeson can be pulled by him in court. Giving Dr. Killinger the benefit of all of the evidence now available to the court, his aspirations have been frustrated by a person or persons at Samford who adhere to doctrine different from Dr. Killinger's professed beliefs.

Samford indisputably has a long history of Baptist connection. The strength of those ties is apparently under challenge, but they definitely exist. As this court sees it, Dr. Killinger and Samford are "whip-sawed" by the set of circumstances in which they find themselves. The court does not envy either party. Samford may fairly be described as a bit tentative in mounting the exemption defenses provided it by 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e). These statutes, respectively, say:

> *This subchapter shall not apply . . . to a religious corporation,* association, *educational institution,* or a society *with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation,* association, *educational institution,* or society *of its activities.*

(emphasis supplied).

\* \* \* \* \* \*

Notwithstanding any other provision of this subchapter . . . *it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.*

(emphasis supplied).

█ It is obvious that Samford hopes to avoid the image of being hidebound or so theologically rigid as to suggest that it is ignoring its obligations, if any, to benefactor Beeson, or that it is dominated by so-called doctrinaire fundamentalists. For instance, it denies that the Alabama Baptist Convention any longer has the right, as it once did, to appoint its board of trustees. Yet, Samford's uncontradicted evidentiary materials demonstrate that all of its trustees must be practicing Baptists and that its students are required to attend periodic convocations, even though the convocations do not necessarily constitute worship services. The student handbook, the staff handbook, the university catalog and the policy manual all indicate a pervasive purpose of Samford (both the university as a community, and Samford, the corporation) to encourage Christianity, as distinguished all from other world religions, and to encourage Christianity with a Baptist

emphasis. In order to constitute a "religious corporation" or an "educational institution," as those terms are used in the Title VII exemption statutes, it is not necessary that a narrow spectrum of Christian or of Baptist doctrine be espoused. Furthermore, Dr. Killinger's complaint itself virtually proves that Samford is an institution "supported," "controlled" and/or "managed" by a particular religion as those terms are used in the exemption statutes.

Unfortunately for this court, the Eleventh Circuit has never been called upon to speak to the precise issue here presented. By disagreeing with Dr. Killinger, this court will avail him of the chance to obtain that expression from the Eleventh Circuit. Dr. Killinger describes his case in *The Birmingham News* as a "precedent-setting case." Without a precedent from the Eleventh Circuit, this court starts the process of "precedent-setting." To start, the court must go to the statutes themselves and to the few holdings of other courts, none of which are binding on this court, and some of which, in this court's view, involve decision-making of which the courts are incapable, as a practical matter and as a constitutional matter.

It is a matter of generally accepted fact that some denominationally connected institutions of higher learning are less strict than others in their insistence on doctrinal adherence and on a focused mission. For instance, this court hazards a guess that a hypothetical college connected to the Unitarian Church might realistically be expected to be more tolerant of a Trinitarian faculty member than a hypothetical college owned by the Mormon Church would be tolerant of an applicant for a teaching job who is a strident critic of Joseph Smith. And yet, the hypothetical Unitarian school could, in this court's opinion, under 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e), decide *not* to hire a Trinitarian for that reason alone. This court recently read in the newspaper that Baylor University, a Baptist school somewhat like Samford, decided for the first time in its history to permit dancing on campus, something Samford has not yet done. Does this mean that Baylor cannot discriminate in its faculty hiring or assignments against or in favor of a particular applicant for chairs of religion based in part on his or her religious beliefs about dancing? This court thinks not.

Legislative history is not necessary to this court's understanding of what Congress intended in 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e). It intended to make the religious exemption broad enough to avoid any trespass upon the First Amendment's guaranty of the free exercise of religion. Although Samford does not argue that the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb, *et seq.*, applies in this case, the enactment of the RFRA in 1993 lends weight to the obvious concern by Congress about the First Amendment's Freedom of Exercise Clause, concern recognized also in 1964 by 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e). This relatively new act simply restates and reenforces the national public policy contained in the first of our Bill of Rights when it says, *inter alia:*

Congressional findings and declaration of purposes

(a) Findings

The Congress finds that—

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification.

42 U.S.C. § 2000bb(a). The word "governments" in this statute includes the government of the United States as manifested by the branch of that government that adopted the Civil Rights Act of 1964. Congress means to tread very lightly when it enacts anything that might constitute a limitation on "free exercise."

Dr. Killinger presents a difficult line for this court to walk. When walking a difficult constitutional line, this court walks even more carefully than Congress does. In construing the Civil Rights Act of 1964, the

court believes it necessary to defer to the particular educational institution as *it* announces and describes its purposes and missions. Samford does not espouse any doctrine that could be called irreligious or purely secular. Samford does not pretend to be Stanford. There is no evidence that can lead any reasonable fact finder to conclude that Samford is disingenuous when it claims to have a religious identity. It is therefore entitled to engage in what Dr. Killinger calls religious discrimination. Accordingly, Samford has successfully invoked the express statutory exemptions provided by Congress in recognition of First Amendment limitations. Neither this court nor any jury is qualified to hold otherwise. This court cannot permit Dr. Killinger on the undisputed evidence, despite the "spin" Dr. Killinger would put on that evidence, to undertake to convince a jury that Samford is not what its official documents say it is. The antonym for "religious" is "secular." Samford is indisputably *not a secular* institution.

This court is reminded of *Fang–Hui Liao v. Dean*, 658 F.Supp. 1554 (N.D.Ala.1987), a case in which this court held that an employer, which had widely advertised itself as an affirmative action employer, and which as a result succeeded in hiring a highly qualified Asian female Ph.D. chemist, violated Title VII by firing her and retaining an equally qualified Caucasian male Ph.D. chemist with a year less seniority than Dr. Liao during a reduction in force. This court admits that in *Liao* it was expanding somewhat the reach of Title VII. This court thought that expansion logical. The Eleventh Circuit in *Liao v. Tennessee Valley Authority*, 867 F.2d 1366 (11th Cir.1989), had no problem in reversing this court and holding that Title VII does not require an employer to fulfill its formal promises to employees, even when those promises tangentially involve the serious matters of race or sex addressed by Title VII. Despite the affirmative action promise by TVA, Dr. Liao's employer, it was free under Title VII to make employment decisions without regard to any such promise so long as it had no intent to discriminate against Dr. Liao or a member of a protected group. What the Eleventh Circuit was teaching is that an employee cannot dress an employer's pre-employment inducement in the clothes of a Title VII proscription.

This court sees a real parallel between Dr. Liao's situation and that of Dr. Killinger. The court assumes *arguendo* that when they were employed both Dr. Liao and Dr. Killinger were promised things they deemed important to their decision to accept. Each was disappointed. They both sought enforcement of broken promises in a forum that has no jurisdiction over broken promises unless appended to a viable federal claim. The Eleventh Circuit made plain in *Liao* that this court has no authority to enforce an affirmative action program through Title VII. It follows that this court lacks the competence to enforce any promise of theological diversity made by Samford. One of these days a case may come along in which a federal court can legitimately be called upon to undertake the subtle distinction between secularity and religiosity, but this is not that case. In deference to the First Amendment, a court must indulge the presumption implicitly recognized by Congress in favor of what an institution says about itself when it claims status as a religious institution. To rebut that presumption is difficult, if not impossible. Dr. Killinger has failed to rebut it. By indulging this presumption, a federal court can avoid a First Amendment challenge to Title VII itself under circumstances like these. It is easy to understand that 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e) were the ways Congress provided for avoiding the First Amendment problem. This court would reach the same conclusion without any such presumption.

Even if Samford has recently distanced itself somewhat from the Alabama Baptist Convention, it certainly has not given up its affiliation with Christianity and with a predominant point of view within the Christian perspective. Although action speaks louder than words, *words* claiming a particular religious orientation, especially when accompanied by action consistent with those words, prevail over the mere possibility that the assertion by the institution is insincere or self-serving.

If Samford proves in the long run to have been disingenuous with this court, a "comeuppance" may occur before the Alabama Baptist Convention, or before the court of public opinion, or before a state court having jurisdiction to construe and to enforce the terms of the Beeson will. If Samford really wants the best of both possible worlds, as Dr. Killinger contends, one of those worlds may very well disappear, but not by action of this court of limited jurisdiction.

If Dr. Killinger were black and had invoked Title VII based on a claim of racial discrimination, this case would be an entirely different one. Except for seniority systems, not here applicable, there are no exemptions in Title VII for acts of racial discrimination. The fact that Samford here enjoys the express religious exemptions set forth in Title VII acts to remove Dr. Killinger's case from this court, making it unnecessary and improper for this court to express any opinion on Dr. Killinger's standing to sue over the Beeson will conditions or on viability of any of his non-federal claims, which will be dismissed without prejudice in a separate order dismissing the Title VII claim with prejudice.